Charles H. Cohen et al., Appellants, v Varig Airlines (S.A. Empresa de Viacao Aerea Rio Grandense), Respondent.

First Department, May 2, 1978

326

APPEARANCES OF COUNSEL

*Irving M. Gruber* of counsel *(Gruber & Gruber, P. C.,* attorneys),* for appellants.

*Mark I. Silberblatt* of counsel *(Hale Russell Gray Seaman & Birkett,* attorneys), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

The only issue presented on this appeal is the amount of damages to which plaintiffs are entitled. Plaintiffs, airline passengers, sued for and recovered the full value of luggage checked with and subsequently lost by the defendant, Varig airlines, as well as consequential damages for the mental and emotional suffering, physical discomfort and inconvenience resulting therefrom. Both parties concede that inasmuch as an international flight was involved the Warsaw Convention is applicable. Varig asserts the limitation of liability provisions of the convention, which, if applicable, would limit plaintiffs' recovery to $700. Plaintiffs contend that the limitation of liability provisions of the convention are inapplicable because of Varig's willful misconduct in the handling of their luggage.

In July of 1974, plaintiffs, Charles and Hermaine Cohen, husband and wife, were on a 28-day tour of South America. They had departed from New York on their itinerary which included Bogota, Lima, Asuncion, Iguassu Falls, Rio de Janeiro, Manaus, Belem, Paramaribo, Georgetown, and the return flight to New York. On July 18, they boarded Varig flight No. 601 at Iguassu Falls, bound for Galeao Airport in Rio de Janeiro. Later, after takeoff, they learned that their flight would terminate in Sao Paulo, Brazil, and that they would be transferred to another flight which was scheduled to land at Dumont Airport in Rio de Janeiro.

Upon their arrival at Sao Paulo, plaintiffs spoke to a Varig sales representative about the possibility of obtaining passage on a flight to Galeao Airport in Rio de Janeiro, since they were scheduled to depart from Galeao Airport early the next morning for Manaus, Brazil. The sales representative, a Mr. Bernsmuller, was able to accommodate plaintiffs and had them transferred to flight No. 854 on an Electra, scheduled to land at Galeao Airport in Rio de Janeiro. While they were still at the airport at Sao Paulo plaintiffs expressed concern that their luggage might not be loaded on flight No. 854. To

assure plaintiffs that matters were being properly taken care of Bernsmuller had their luggage brought to them and issued two new baggage tickets for flight No. 854. He further assured plaintiffs that he would personally see that their luggage was placed aboard flight No. 854. This conversation took place in an area known as "the shed". There was no other baggage in the immediate vicinity. As further assurance Bernsmuller went out to the airfield to check on the luggage. On his return he stated that he "personally had seen to it that plaintiffs' luggage was actually placed on flight #854." He further stated that he "saw (the luggage) on the plane."

When flight No. 854 was called, plaintiffs realized that the flight was bound for New York with a stopover at Rio de Janeiro. They boarded with about 30 other passengers. On the arrival of flight No. 854 at Galeao Airport on the evening of July 18, an announcement was made that the passengers were to disembark, since the flight was continuing its journey to New York on another aircraft, a Boeing 707. It was nighttime. The passengers boarded a waiting bus which drove them to the 707. When it came time to get off the bus to board the 707, plaintiffs protested to the Varig representative in charge that they were not continuing on the flight to New York. They were told to stay on the bus. Plaintiffs were then driven to the terminal building. When they inquired about their luggage they were directed to the baggage receiving area. After a time when it became apparent that their luggage was not being delivered, plaintiffs complained to various Varig personnel, including Celestino Pazinatto, Varig's lost and found agent; who twice checked with the ramp supervisor in charge of unloading the Electra and loading the 707. Efforts to locate plaintiffs' luggage were unavailing.

By this time Mr. Cohen was becoming indignant. He kept insisting to Varig's personnel that he had gotten off flight No. 854, that he had not received his luggage, and that it was being taken to New York on the Boeing 707. When the announcement was made for the passengers of flight No. 854 to board, Mr. Cohen demanded that his luggage be removed from the New York bound plane. Varig's personnel refused and told him that they "would not go to the expense of unloading the plane" for him. Pazinatto told plaintiffs that the flight would be returning from New York City in two days and that they could get their luggage back at that time. Mr. Cohen explained that they were leaving the next morning for

Manaus, Brazil. He showed Pazinatto his flight tickets and informed him that he and his wife had no clothes other than what was on their backs, that they had 18 days left on their tour which was taking them to the Amazon jungle and to Georgetown, Guiana, where they had friends and expected to be entertained. When Pazinatto was asked again to go out to the plane to get the luggage he refused, stating: "we will not do it. You will get it back on Saturday morning." When the loading of the 707 was completed the plane departed.

The interval of time between plaintiffs' arrival at Galeao Airport and the departure of flight No. 854 for New York was estimated at one-half hour. During this time Varig's personnel steadfastly refused to look for plaintiffs' luggage on the Boeing 707. Testimony adduced at trial reveals that it would have taken one hour to unload the Boeing 707, check the baggage, and reload. After the flight's departure plaintiffs were given $60 by a Varig representative to tide them over until the luggage came back on Saturday, July 20.

Varig sent tracers to every destination to which its air-planes flew from Galeao Airport and radiogrammed New York City prior to the arrival time of flight No. 854. None of these attempts to locate plaintiffs' luggage was successful.

The next morning, July 19, according to schedule, plaintiffs flew to Manaus. There they made several visits to the Varig office, as instructed, to inquire about their luggage, but without any success. They were unable to purchase ready-made clothes in Manaus and after two days they left, again in accordance with their itinerary, for the journey by ship down the Amazon River and the completion of their tour.

At trial plaintiffs testified to the physical discomfort of being without their clothing and personal effects. They also claimed mental distress in the nature of humiliation and embarrassment from being inappropriately attired, either in the same clothing or in ill-fitting hastily purchased apparel, at social affairs which had been prearranged with dignitaries and friends of high social levels in the countries being visited. For instance, in Georgetown, a dinner at which the Chief Justice and other State officials were guests was given in honor of Mr. Cohen. He was compelled to wear the same dishevelled suit that he had been traveling in. His wife's predicament was no better. For 18 days of their tour, plaintiffs were without their water purification implements. They spent needless hours shopping, without success, for suitable clothing. In a humid,

tropical climate they had no second set of clothing into which to change. As a consequence, plaintiffs contend that their trip was ruined.

On their return to New York Varig's regional general manager offered plaintiffs an additional $640 in reimbursement for their lost luggage. When Mr. Cohen remonstrated with him, the general manager stated: "Do you expect us to unload a whole plane just for the two of you? We don't do that."

Thereafter, plaintiffs commenced this action in the Civil Court for damages for Varig's willful failure to deliver their luggage. Varig interposed a general denial and asserted, *inter alia,* the affirmative defenses of its tariff provisions and the Warsaw Convention.

After a trial without jury the court held that the Warsaw Convention controlled, inasmuch as plaintiffs were traveling on an international flight. The court found that the provisions of the convention limiting claims for lost baggage to $20 per kilogram, or $700 in the present case, were not applicable since Varig's refusal to unload plaintiffs' luggage constituted "wilful misconduct" within the meaning of subdivision (1) of article 25 of the convention (49 US Stat 3014, 3020). Plaintiffs were awarded $6,440.65, including $3,250 for their physical inconvenience, discomfort and mental suffering. The court rejected Varig's contention that the terms of its tariff barred a recovery for consequential damages.

On appeal, Appellate Term, by a divided court, modified the judgment by decreasing the award of damages to $700, holding that there was "insufficient evidence in the record to support the trial court's finding that the act of defendant * * * constituted 'wilful misconduct' within the purview of subdivision (1) of article 25 of the Warsaw Convention". (88 Misc 2d 998.) Appellate Term granted leave to appeal to this court.

Subdivision (2) of article 22 of the Warsaw Convention (49 US Stat 3019) which generally applies to international air transportation, limits a carrier's liability to $20 per kilogram (i.e., $700 in the instant case) of checked baggage. Subdivision (1) of article 25 of the convention, however, eliminates the limitation of liability where there is willful misconduct by the carrier. Subdivision (1) of article 25 provides as follows: "The carrier shall not be entitled to avail himself of the provisions

of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct."

In *Grey v American Airlines* (227 F2d 282, 285, cert den 350 US 989) the Court of Appeals for the Second Circuit spoke of "wilful misconduct" as "a conscious intent to do or omit doing an act from which harm results to another, or an intentional omission of a manifest duty. There must be a realization of the probability of injury from the conduct, and a disregard of the probable consequences of such conduct."

In *Goepp v American Overseas Airlines* (281 App Div 105, 111, affd 305 NY 830, cert den 346 US 874) this court construed "wilful misconduct", as it applies to the Warsaw Convention, as follows: "Wilful misconduct * * * depends upon the facts of a particular case, but in order that an act may be characterized as wilful there must be on the part of the person or persons sought to be charged, a conscious intent to do or to omit doing the act from which harm results to another * * *. The burden of establishing wilful misconduct rests upon plaintiff."

In *Berner v British Commonwealth Pacific Airlines* (346 F2d 532, 536-537) the Court of Appeals (2d Cir) restated the accepted charge on "wilful misconduct", as it applies to the Warsaw Convention, in the following language: "wilful misconduct is the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage, or it may be the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences * * *, [or] the intentional omission of some act, with knowledge that such omission will probably result in damage or injury, or the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission."

In our view the facts support the trial court's finding of willful misconduct. As flight No. 854 readied for departure, plaintiffs' luggage had to be at Galeao Airport in one of three locations, that is, in either the baggage receiving area, where it was not to be found, in the Electra or in the Boeing 707. On the evidence it is not a fair inference to conclude that plaintiffs' luggage had not been placed on the Electra at Sao Paulo. However, even were we so to conclude, then Bernsmuller's

actions in assuring plaintiffs that he had seen their luggage on the Electra would constitute willful misconduct.

The Electra had been unloaded in the darkness of the runway. When plaintiffs' luggage was not delivered to the receiving area, it should have been obvious that it had to have been loaded on the 707 along with all the other passengers' baggage. Pazinatto's advice to wait for the return flight confirms the fact that he full well realized that the luggage had to be on the 707. Although the ramp supervisor was asked to check the baggage being transferred from the Electra to the Boeing 707, it is not clear from the record whether the supervisor even made such a check. He did not testify at trial. The only witness to testify for Varig was Pazinatto. He testified that he personally inspected the Electra but only after the departure of the Boeing 707. No luggage was found.

■ ■ While, concededly, this is not the case of ordinary negligence, we must not lose sight of the fact that the standard of proof imposed on a plaintiff who claims willful misconduct by a carrier is to prove his contentions by a fair preponderance of the credible evidence, and no more. In our view, that burden has been met. We are not persuaded otherwise by the fact that plaintiffs' luggage was never recovered in New York, a circumstance as innocuous as the fact that their luggage was never located at Galeao Airport or any of the other airports to which tracers were sent.

The decision not to unload the 707 was motivated by a desire to avoid the expense of unloading and not by any doubt as to the whereabouts of the luggage. The options available to Varig were either to satisfy its contractual obligations to plaintiffs, thereby incurring expense and perhaps delaying the flight, or insisting that plaintiffs take the loss. It chose the latter. The determination was purely a business one.

Furthermore, Varig had a full appreciation of what its decision meant to plaintiffs. Pazinatto had been told that plaintiffs had 18 more days remaining in their tour of South America. He knew that they could not await the flight's return from New York, that they were leaving for Manaus the next morning. He knew that all of their clothing and necessaries for the trip were inside the missing luggage.

■ In these circumstances, we conclude that plaintiffs have shown an intentional omission on Varig's part to perform a manifest duty which it owed plaintiffs under the terms of the contract of carriage, with a realization and disregard of

the probable consequences of its conduct. *(Grey v American Airlines,* 227 F2d 282, *supra; Berner v British Commonwealth Pacific Airlines,* 346 F2d 532, *supra; Goepp v American Overseas Airlines,* 281 App Div 105, affd 305 NY 830, cert den 346 US 874, *supra; Pekelis v Transcontinental & Western Air,* 187 F2d 122.)* Consequently, and in accordance with subdivision (1) of article 25 of the Warsaw Convention, defendant's liability for the loss of the luggage is not limited by the provisions of subdivision (2) of article 22 to $20 per kilogram. Hence, the trial court's award of $2,679 for the actual value of the lost luggage and their contents should be reinstated.

■ Varig claims that the portion of the baggage loss award that compensates plaintiffs for loss of jewelry[1] cannot stand because its own tariff bars recovery for jewelry loss. Varig's tariff cannot limit any recovery for jewelry loss since rule 2 (A)(1) of the tariff and article 23 of the Warsaw Convention both provide that any provision of the tariff attempting to fix a lower limit for the liability of the carrier which is inconsistent with the terms of the convention is invalid. There is no limitation on jewelry loss in the provisions of the convention other then the limitation contained in subdivision (2) of article 22, which, for reasons already stated, we hold to be inapplicable.

This leaves one final element of the damage award for our consideration. The trial court awarded the sum of $3,250 for both plaintiffs for physical inconvenience, discomfort and mental suffering. Varig asserts that even if the Warsaw Convention does not limit its liability, rule 16 (C)(15) of its own tariff bars recovery for consequential damages. Rule 16 (C)(15) provides as follows: "carrier shall not be liable in any event for any consequential or special damage arising from carriage subject to this tariff, whether or not carrier had knowledge that such damages might be incurred."

This court has upheld tariff provisions similar to the case at bar. In *Bruce Glen, Inc. v Emery Air Frgt. Corp.* (24 AD2d 145) we upheld a provision limiting a carrier's liability to the value declared on the air bill. However, rule 2 (A)(1) of Varig's tariff, which has already been alluded to is, by its terms, subordinate to the provisions of the convention. Rule 2 (A)(1) of the tariff provides: "such carriage shall be subject to the provisions of such Convention and to this tariff to the extent

---

1. Approximately $750 was awarded for the loss of jewelry in the wife's luggage.

that this tariff is not inconsistent with the provisions of the Convention."

■ ■ In this connection article 19 of the convention provides that "[t]he carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods." The trial court properly held that rule 16 (C)(15) of the tariff barring the recovery of consequential damages was inconsistent with article 19 of the convention. Damage caused by delay, quite obviously, contemplates consequential loss. Neither law nor logic suggests any reason why plaintiffs' damages should be any the less because their luggage was lost, rather than delayed. We do, however, conclude that this is not the appropriate case for the award of special damages for physical inconvenience, discomfort, and mental anguish.

■ Damages here should be awarded in accordance with the laws of New York. (Cf. *Mertens v Flying Tiger Line,* 341 F2d 851, 858, cert den 382 US 816; *Husserl v Swiss Air Transp. Co.,* 351 F Supp 702, affd 485 F2d 1240.) Whether liability is fastened on a theory of contract or tort, New York is the jurisdiction with the greatest or dominant interest in the matter and its law ought to apply. *(Babcock v Jackson,* 12 NY2d 473; *Auten v Auten,* 308 NY 155.) Plaintiffs are New York residents. They purchased their tickets from Varig at its New York office. Their trip began in New York. New York was the destination of the flight on which their luggage was lost.

The law has been traditionally reluctant to extend its protection against the infliction of mental distress, even for intentionally inflicted wrongs.[2] This has been equally true in New York. Until it was overruled in 1961 *Mitchell v Rochester Ry. Co.* (151 NY 107), which barred a recovery for injuries occasioned by fright where there was no impact or immediate personal injury, represented the law of this State. In that case the plaintiff claimed fright and excitement and a resultant miscarriage caused by the approach of a team of horses which just managed to stop without striking her.

---

2. For a summary of the progress of the law in this regard see Bohlen and Polikoff, *Liability in New York for the Physical Consequences of Emotional Disturbance,* 32 Col L Rev 409; Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv L Rev 1033; see, also, 1936 Report of NY Law Rev Comm, Study Relating to Liability for Injuries Resulting from Fright or Shock, pp 375-454; NY Legis Doc No. 65(E); McNiece, *Psychic Injury and Tort Liability in New York,* 24 St John's L Rev 1.

Courts, however, have been willing to allow damages where the mental anguish accompanies a slight physical injury *(Ferrara v Galluchio,* 5 NY2d 16) or some impact upon the person of the plaintiff attends the wrong *(Comstock v Wilson,* 257 NY 231). In New York, the impact requirement in a cause of action based on negligence was eliminated when the Court of Appeals in *Battalla v State of New York* (10 NY2d 237) overruled *Mitchell v Rochester Ry. Co. (supra).* The impact rule was stripped of any vestige of vitality in negligence cases by the Court of Appeals' decision in *Johnson v State of New York* (37 NY2d 378) which extended the *Battalla* rationale to a situation where there was not even an apprehension of actual physical harm or threat. In that case, the daughter of a hospital patient was erroneously notified of her mother's death when in fact her mother was alive and well. Damages for emotional harm and mental distress were allowed.

In cases other than negligence, the rule always was that if some independent traditional tort could be asserted, then that cause of action could serve as the vehicle to allege mental damages and a recovery therefor was allowed. Thus, a recovery for mental damages was allowed by our courts in such traditional actions as those for assault *(Williams v Underhill,* 63 App Div 223), false imprisonment *(Tierney v State of New York,* 266 App Div 434), willful conversion *(Cauverien v De Metz,* 20 Misc 2d 144), and malicious prosecution *(Black v Canadian Pacific Ry.,* 218 F 239). It has also been allowed in cases of extreme outrage where the tort-feasor's conduct exceeds all bounds of decency usually tolerated by society and is calculated to and does cause mental distress of a serious nature. The following are examples of the type of wrong where recovery has been allowed: threats of harm, racially motivated against plaintiffs and their children to prevent them from moving into a certain neighborhood *(Ruiz v Bertolotti,* 37 Misc 2d 1067); hounding a plaintiff on the streets and in public places *(Flamm v Van Nierop,* 56 Misc 2d 1059); an invitation, prolonged or repeated, to a woman to sexual intercourse accompanied by the forwarding to her of indecent pictures *(Mitran v Williamson,* 21 Misc 2d 106); the case of a former suitor who, having jilted a woman, wrote her jeering verses and taunting letters *(Halio v Lurie,* 15 AD2d 62) and, finally, those cases involving the mishandling of dead bodies *(Finley v Atlantic Transp. Co.,* 220 NY 249) where recovery is allowed on the theory of a "property right" to the body,

usually in the next of kin *(Gostkowski v Roman Catholic Church of Sacred Hearts of Jesus and Mary,* 262 NY 320).

One area where New York courts have long recognized a separate cause of action for the intentional infliction of mental suffering, even though the mental disturbance was not attended by any illness or physical injury, is in those cases holding a common carrier liable for insulting a passenger (see, e.g., *Gillespie v Brooklyn Hgts. R. R. Co.,* 178 NY 347; *Hamilton v Third Ave. R. R. Co.,* 53 NY 25; *Busch v Interborough R. T. Co.,* 110 App Div 705, affd 187 NY 388) and the innkeeper or hotelkeeper liable for the insult to his guest (cf. *Boyce v Greeley Sq. Hotel Co.,* 228 NY 106; *De Wolf v Ford,* 193 NY 397).

■ ■ Although courts are, at long last, moving in the direction of recognizing one's interest to mental and emotional tranquility as an area entitled to legal protection, we know of no authority which sanctions a recovery against a carrier for mental distress and physical inconvenience where the gravamen of the wrongdoing is either the loss or mishandling of luggage. Although Varig's callous disregard for plaintiffs' plight and willful renunciation of its contractual obligation to its passengers was motivated by selfish economic interest and justifies a finding of willful misconduct under the provisions of the Warsaw Convention, we are reluctant to extend the rationale of the insult cases to the circumstances presented here and allow damages for mental suffering. (Cf. *Fischer v Maloney,* 43 NY2d 553.) Moreover, in *Rosman v Trans World Airlines* (34 NY2d 385) the Court of Appeals, in construing the term "bodily injury" as it appears in article 17 of the Warsaw Convention, held that psychic trauma alone or even psychic trauma causing bodily injury is not compensable. In our view, plaintiffs are adequately compensated for their loss to the extent the law allows by the recovery of the actual value of their lost luggage and its contents.

Accordingly, the order of Appellate Term, entered November 26, 1976, which modified a judgment, Civil Court of the City of New York, New York County (DANZIG, J.), entered December 15, 1975, should be modified on the law and on the facts, without costs, to the extent of reinstating the damage award of $2,679, and otherwise affirmed.

LUPIANO, J. P. (dissenting in part). This action was commenced in the Civil Court on October 9, 1974, by service of a summons containing "[a] statement of the nature and sub-

stance of the plaintiff's cause of action" as follows: "Failure of defendant, as a consequence of its wilful misconduct, to deliver to plaintiffs their luggage with its contents in the possession of defendant, upon demand of plaintiffs, plaintiffs claim damages, including damages for mental anguish, inconvenience, discomfort, humiliation and annoyances as well as punitive damages."

The relevant facts are briefly stated: Plaintiffs, as part of a tour of South America, boarded Varig Flight No. 601 from Iguassu Falls to Rio de Janeiro on July 18, 1974. After takeoff, plaintiffs learned that Flight No. 601 would terminate in Sao Paulo and that at Sao Paulo the passengers would be transferred to another flight going to Dumont Airport in Rio de Janeiro. Plaintiffs had, however, planned to land at Galeao Airport in Rio de Janeiro (where they had a connecting flight), and they so informed Varig personnel at the Sao Paulo Airport. Accordingly, at Sao Paulo plaintiffs were transferred to Varig Flight No. 854, which was to land at Galeao. Plaintiffs last saw their luggage at the Sao Paulo Airport on July 18, 1974. At that airport, plaintiffs were told by a Varig sales representative that he had seen to it that the luggage was on board Flight No. 854. After stopping at Galeao Airport in Rio de Janeiro, Flight No. 854 continued on to New York, using another plane (a 707 instead of an Electra). On arrival at Galeao, plaintiffs, who were not continuing to New York, were brought to Varig's customer area to reclaim their luggage. When plaintiffs did not find their luggage, they complained to Varig employees. Among the latter was Celestino Pazinatto, who testified at trial that in response to plaintiffs' complaint he twice checked with the ramp supervisor, the Varig employee in charge of unloading the Electra and loading the 707. Mr. Pazinatto also checked the customers area.[1] These efforts proved unsuccessful. Plaintiffs, perceiving that Flight No. 854's departure was imminent, requested that the flight be delayed and their luggage located, i.e., that the 707 be unloaded in an effort to locate said luggage. In view of the imminence of Flight No. 854's departure, Varig's personnel declined to do so. Varig sent tracers, by cable, to every city to which it flew from Galeao, including Sao Paulo. A radiogram

---

1. Plaintiff Charles Cohen testified that after he complained to Varig personnel at the Varig counter, he saw someone picking up a phone and the personnel engaged in consultation. Of course, being unfamiliar with the language spoken by Varig personnel, plaintiffs could not testify as to the nature of these conversations.

was sent to New York prior to Flight No. 854's arrival there. None of these attempts to locate plaintiffs' luggage were successful.

After a nonjury trial, Civil Court awarded plaintiffs $6,440.65 inclusive of interest, costs and disbursements. Of this amount, $3,250 was awarded for plaintiffs' physical inconvenience, discomfort and mental suffering. No recovery was given for punitive damages. The Trial Judge found that plaintiffs were traveling on an international flight and that the provisions of the Warsaw Convention controlled. He noted that "[t]here was no evidence to show that the baggage was lost, stolen or misdelivered at the time that the plane was in Rio de Janeiro." (85 Misc 2d, at p 657.) This circumstance impelled the trial court to conclude: "Varig's refusal to discharge plaintiffs' baggage was an intentional omission to perform their manifest duty under the terms of their contract of carriage." (85 Misc 2d, at p 657.) Clearly, the mere inability of defendant Varig Airlines to explain the loss of plaintiffs' luggage does not of itself mandate the legal conclusion that defendant's negligence amounted to an *intentional* omission to perform a duty under the contract of carriage. The omission to perform a duty envisioned by the contract of carriage constitutes negligent performance, but such negligence may be unintentional as compared with intentional conduct.

Civil Court correctly perceived that as the plaintiffs were traveling on an international flight, the provisions of the Warsaw Convention controlled. Under subdivision (2) of article 22 of the convention, plaintiffs' recovery for lost luggage is limited to $700 unless Varig was guilty of "wilful misconduct" within the meaning of subdivision (1) of article 25.[2]

"Wilful misconduct * * * depends upon the facts of a particular case, but in order that an act may be characterized as wilful there must be on the part of the person or persons

---

2. Subdivision (2) of article 22 and subdivision (1) of article 25 of the Warsaw Convention provide, respectively: "In the transportation of checked baggage and of goods, the liability of the carrier shall be limited to a sum of [$20] per kilogram, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum if the cost so requires." (Convention, art 22, subd [2]; 49 US Stat 3019.)

"The Carrier shall not be entitled to avail himself of the provisions of this Convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct." (Convention, art 25, subd [1]; 49 US Stat 3020.)

sought to be charged, *a conscious intent to do or to omit doing the act from which harm results* to another, or an *intentional omission of a manifest duty* [emphasis supplied]. There must be a realization of the probability of injury from the conduct, and a disregard of the probable consequences of such conduct. The burden of establishing wilful misconduct rests upon plaintiff. *(Ulen v. American Air Lines,* [1948] U.S. Av. Rep. 161, affd. *sub nom. American Air Lines v. Ulen,* 186 F.2d 529, 533; *Ritts v. American Overseas Airlines,* [1949] U.S. Av. Rep. 65; *Pekelis v. Transcontinental & Western Air,* [1950] U.S. Av. Rep. 296, revd. on other grounds 187 F.2d 122, certiorari denied 341 U.S. 951; 65 C.J.S., Negligence, § 9.) In their excellent treatise on Air Law, Shawcross and Beaumont ([2d ed.], p. 345) state * * * 'It is essential to remember that "the *mis*conduct, not the conduct, must be wilful" * * * Thus, if a pilot gives the ground control a wrong indication of his position, it may be negligent, and in one sense wilful (in that the pilot intends to give *an* indication of his position), but it is not wilful misconduct unless he knows he is giving a *wrong* indication.' " *(Goepp v American Overseas Airlines,* 281 App Div 105, 111-112, affd 305 NY 830, cert den 346 US 874; see *Grey v American Airlines,* 227 F2d 282, 285.)

The Appellate Term of the Supreme Court on appeal modified the judgment of the Civil Court to the extent of decreasing the plaintiffs' recovery to $700 in compliance with the limits set by the Warsaw Convention. In so determining, the Appellate Term opined: "There was insufficient evidence in the record to support the trial court's finding that the act of defendant in refusing to unload all luggage from its plane in Rio de Janeiro constituted 'wilful misconduct' within the purview of subdivision (1) of article 25 of the Warsaw Convention." Plaintiffs thereafter appealed to this court.

The determination of the Appellate Term should be affirmed. There is no basis upon which the trial court could conclude on this record that the Varig personnel took no measures to locate and deliver to plaintiffs the latter's luggage at Galeao airport in Rio de Janeiro. Clearly, the basis of the award at Civil Court was the mere fact that Varig refused to unload the 707 to search for plaintiffs' luggage on the assumption that the luggage was mistakenly put on board that plane at a time of imminent departure of that plane. This isolated fact must be viewed in the totality of the surrounding circumstances. The refusal to unload the 707 viewed in context with

the surrounding circumstances is consistent with Varig's responsibility to the passengers on its New York bound flight and with the testimony of Varig's employee, not rebutted by plaintiffs, that efforts by Varig to locate plaintiffs' luggage at the airport in Rio were unavailing. Certainly the evidence did not demonstrate that Varig personnel, knowing that plaintiffs' luggage was being transferred from the Electra to the 707, refused to take any action to secure such luggage for plaintiffs. The latter circumstance, if shown, could justify finding defendant guilty of an *intentional* omission of a manifest duty.

Plaintiffs attempt to prove the fact of an intentional omission of a manifest duty by circumstantial evidence. "In order to prove a fact by circumstances, there must be positive proof of some fact which does not itself directly establish the fact in dispute, but which affords a reasonable inference of its existence. The fact upon which it is sought to base an inference must be shown and not left to rest in conjecture. If and when the fact is shown, it *must* then *appear that the inference drawn is the only one that is fair and reasonable* (see *Markel v Spencer,* 5 AD2d 400, affd 5 NY2d 958)" *(Matter of Ridings v Vaccarello,* 55 AD2d 650, 651 [2d Dept 1976]). As noted in *Nieskes & Craig v Schoonerman* (40 AD2d 931, 932): "Circumstantial evidence may, of course, support a verdict but such evidence is not sufficient by itself 'where the circumstances give equal support to inconsistent conclusions, or are equally consistent with contradictory hypothesis' [citation]. It is not necessary to exclude every other hypothesis 'but every other reasonable hypothesis must be excluded' *(Boyce Motor Lines v. State of New York,* 280 App. Div. 693, 696, affd. 306 N.Y. 801)." Misconduct there may have been, but the circumstantial evidence does not justify the Civil Court's conclusion that such was "wilful" within the meaning of the Warsaw Convention.

Even assuming there was willful misconduct which obviated application of the limitation of recovery provisions of the Warsaw Convention, the trial court's award to plaintiffs of $3,250 for physical inconvenience, discomfort and mental distress cannot be sustained.[3] This view has now been adopted by the majority. To reiterate: of the $5,929 damages (exclusive of interest) awarded by Civil Court, $3,250 were damages for physical inconvenience, discomfort and mental suffering and

---

3. The *balance* of this analysis assumes that willful misconduct within the meaning of the Warsaw Convention is present.

approximately $1,000 were damages for loss of jewelry contained in the lost baggage. Varig's argument that its own tariff bars recovery for consequential damages resulting from loss of baggage is viable only insofar as such tariff is not inconsistent with the provisions of the Warsaw Convention.[4] With respect to the jewelry loss, Varig's attempt to invoke rule 16(C)(12) of its tariff is of no avail. The jewelry was part of the actual value of the loss sustained by plaintiffs and under the convention, willful misconduct being present, Varig could not avoid liability. However, the award of consequential damages for physical inconvenience, discomfort and mental distress is improper.

"A common carrier is regarded as an insurer of baggage delivered into its exclusive possession against all losses of whatever kind, with the exception of those arising from what is known as an act of God, and those caused by the public enemy, and those arising from the act of the public authority or the act of the shipper * * * A carrier's common-law liability as insurer for property carried as baggage is limited to that property properly constituting baggage" (7 NY Jur, Carriers, § 434).

"The measure of damages as to articles of baggage lost is what they were worth for use by the plaintiff, particularly with respect to clothing, and not their market value * * * Where the plaintiff in his pleading itemizes his loss, placing a

4. The pertinent provisions of Varig's tariff regarding liability for baggage are as follows:

Rule 2. "Applicability of Tariff (A) *General* (1) This tariff shall apply to all carriage * * * provided, however, that if, according to the contract of carriage made by the parties, the place of departure and the place of destination * * * are situated * * * within the territories of * * * Parties to the Convention * * * such carriage shall be subject to the provisions of such Convention and to this tariff to the extent that this tariff *is not inconsistent with the provisions of the Convention"* (emphasis supplied).

Rule 16(C)(9): "Any liability of Carrier is limited to U.S. $20.00 * * * or its equivalent per kilogram in the case of checked baggage, and $400.00 * * * or its equivalent per passenger in the case of unchecked baggage or other property, unless a higher value is declared in advance and additional charges are paid pursuant to Carrier's Tariff. In that event the liability of Carrier shall be limited to such higher declared value. In no case shall the Carrier's liability exceed the actual loss suffered by the passenger. All claims are subject to proof of amount of loss."

Rule 16(C)(12): "Carrier is not liable for loss, damage to, or delay in the delivery of * * * jewelry * * * or samples which are included in the passenger's checked baggage, whether with or without the knowledge of carrier."

Rule 16(C)(15): "Carrier shall not be liable in any event for any consequential or special damage arising from carriage subject to this tariff whether or not Carrier had knowledge such damage might be incurred."

separate value on each article of 'about' so much, the recovery cannot exceed the total of such items, with interest added. The plaintiff may not recover any sentimental or fanciful value he may for any reason place upon his baggage" (7 NY Jur, *supra,* § 447).

Thus, whether the action against Varig is viewed as founded in contract or in tort and even in the absence of compensation for the transportation of the baggage other than the compensation paid for the conveyance of the plaintiffs, the carrier is liable for the loss of plaintiffs' baggage, that is, for the actual value of the baggage—what it was worth for use by plaintiffs.

Further, the Warsaw Convention governs the nature of injuries for which an air carrier is liable, but does not specify allowable elements of damage flowing from those injuries (see *Rosman v Trans World Airlines,* 34 NY2d 385).[5] The Civil Court recognized that New York law would govern the elements of damage to be recovered in this action as New York was both the place of ultimate destination and place of business of defendant Varig through which the contract was made. In light of the convention's silence as to the elements of damage to be recovered, the provision of Varig's own tariff exempting consequential or special damage as an element of recoverable damage controls (see *Bruce Glen, Inc. v Emery Air Frgt.,* 24 AD2d 145). Accordingly, the award of damages for physical inconvenience, discomfort and mental suffering is also barred under Varig's tariff.

Generally, apart from tariff considerations, where personal property is negligently destroyed or damaged, no recovery may be had for the physical and mental suffering of a plaintiff caused by such destruction or damage (NY Damages Law, § 873). If the loss of the property was occasioned by a malicious, wanton act or gross negligence, mental distress may be recoverable (see NY Damages Law, § 872). "There is no cause of action for emotional distress and ensuing injury caused by * * * awareness of unintended damage to one's property *(Van Patten v. Buyce,* 37 AD2d 448, mot for lv to app den 30 NY2d 481)" *(Stahli v McGlynn,* 47 AD2d 238, 240). Thus, in order to sustain a recovery by plaintiffs for mental distress, the finding

---

**5.** In *Rosman v Trans World Airlines,* the Court of Appeals held that under the Warsaw Convention, once bodily injury is established, damages sustained as a result of that injury are recoverable, including mental suffering, but psychic trauma alone, or even psychic trauma causing bodily injury, is not compensable. Cf. *Krystal v British Overseas Airways Corp.,* 403 F Supp 1322.

of "wilful misconduct" is not enough. While such misconduct renders the limitation of liability provision of the Warsaw Convention inapplicable, it is necessary to determine whether the willful misconduct partakes of that degree of malicious intent which would permit an award for mental suffering, discomfort and inconvenience (see, also, NY Damages Law, § 902; cf. *Fischer v Maloney,* 43 NY2d 553). Again, the mere fact that Varig personnel refused to unload the 707 which was to imminently depart for New York, does not suffice on this record to demonstrate malicious intent which would justify an award for mental suffering.

Finally, no recovery was given by the trial court for punitive damages. Such damages, in any event, could be recoverable only if the defendant's conduct amounted to a willful detention of plaintiffs' property with reckless and wanton indifference to plaintiffs' right or a malicious intent to deprive plaintiffs of same. Again, this record would not admit of such an award. Therefore, assuming *"wilful misconduct"* on defendant's part, the trial court was not justified in awarding plaintiffs $3,250 for physical inconvenience, etc. and the $5,929 award (exclusive of interest and costs) must be reduced to $2,679. However, as noted above, there is insufficient evidence in this record to support a finding of "wilful misconduct" within the purview of the Warsaw Convention and the plaintiffs' recovery must be limited to $700 in compliance with the limits set by the convention.

Accordingly, the order of the Appellate Term, entered November 26, 1976, which modified a judgment of the Civil Court, New York County (DANZIG, J.), entered December 15, 1975, by decreasing the award from $6,440.65 (inclusive of interest and costs) to $700 with interest and costs, should be affirmed.

SANDLER, J. (dissenting in part). I am in agreement with the opinion of the court except with regard to its denial of recovery for emotional distress.

The court's review of the evolution of New York law with respect to recovery for emotional distress is comprehensive and fair. The underlying judgment that recovery should not ordinarily be permitted for emotional distress incident to the loss of baggage by a common carrier or bailee in the absence of a specific contractual understanding is clearly sound. However, the facts painstakingly detailed in the court's opinion disclose two circumstances that taken together make a com-

pelling argument for such recovery under the law as it has been developing for many years.

First, as appropriately found, the defendant's behavior constituted willful misconduct.

Second, as unmistakably appears from the evidence, the willful misconduct occurred at a time when the defendant's agents had been explicitly informed that plaintiffs were in the middle of what was obviously a long-planned vacation with a carefully developed itinerary, which would be painfully disrupted by the loss or unavailability of their luggage and its contents.

The reality of the distress suffered by these plaintiffs cannot be doubted. Few would contend that the economic value of their lost property represents fair or full compensation for the injury that was in fact sustained.

The controlling principle surely was that set forth in *Battalla v State of New York* (10 NY2d 237, 240): "It is fundamental to our common-law system that one may seek redress for every substantial wrong."

Accordingly, the order of the Appellate Term should be modified, on the law and on the facts, to the extent of reinstating the total judgment granted in the Civil Court.

BIRNS and LANE, JJ., concur with SULLIVAN, J.; LUPIANO, J. P., and SANDLER, J., dissent in part in separate opinions.

Order, Appellate Term, First Department, entered on November 26, 1976, modified on the law and on the facts, to the extent of reinstating the damage award of $2,679 and otherwise affirmed, without costs and without disbursements.